# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TIMOTHY JONES, | ) |
| Plaintiff, | ) |
| | ) Case No. 12 C 6151 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

## **OPINION AND ORDER**

Timothy Jones brought this action under 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security ("the Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423, and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381a. (Dkt. 1.) Jones asks the court to reverse and remand to the Commissioner.[2] (Dkt. 14.) The Commissioner moves for summary judgment in her favor. (Dkt. 15.) For the reasons stated below, the court grants Jones's request insofar as it seeks a remand, denies the Commissioner's motion, and remands the case for further proceedings consistent with this opinion.[3]

---

[1] Under Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin was automatically substituted as defendant for the former Commissioner, Michael J. Astrue, when she became the Acting Commissioner of Social Security on February 14, 2013. *See* Fed. R. Civ. P. 25(d).

[2] In accordance with the court's instructions, Jones has filed a brief, not a motion, requesting reversal and remand of the Commissioner's decision. (*See* dkt. 13.)

[3] The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c).

# BACKGROUND

I.  **Employment History**

Jones is currently fifty years old and lives in Chicago, Illinois. (Administrative Record ("AR") 40.) He testified at the hearing before the Administrative Law Judge ("the ALJ") that he lives with his wife, although he lived alone for at least part of the relevant time period. (AR 48, 178.) Jones also testified that he has a twenty-one-year-old daughter who does not live at home. (AR 49.)

Jones completed high school and two years of college and has worked as an hourly employee in various positions since 1993. (AR 55.) From January 1993 until October 1999, Jones worked as a security officer and he checked guests in and out of a housing complex. (AR 187, 196.) Jones also served as an on-call security officer for ATM technicians between 1999 and 2007 and held those positions for time periods spanning several months to several years. (AR 189, 191–92, 194.) Further, from October 2008 to February 2009, Jones worked as a security guard at a residential building. (AR 188.) In that capacity, Jones sat behind a desk and signed in guests. (*Id.*) Jones also delivered cargo as a truck driver from October 1999 to January 2000 and worked as a truck driver again between October 2006 and March 2007, this time in the food-service industry. (AR 190, 195.) Between May and September of 2002, Jones cleaned bathrooms as a janitor. (AR 193.)

Since his alleged disability onset date of February 20, 2009, Jones has held several jobs for limited periods of time. Specifically, Jones worked for CBS Security Services Inc. during the first quarter of 2009 (AR 149), Intertech Group Inc. during the second quarter of 2009 (AR 148), World Security Bureau Inc. during the second and third quarters of 2009 (AR 145, 148), G&B Busing Inc. during the third quarter of 2009 (AR 147), Ewing-Lundberg & Associates, Inc.

during the third and fourth quarters of 2009 (AR 146), A-R Security Services, Inc. during the fourth quarter of 2009 (AR 147), and Guardsmark, LLC during the first quarter of 2010. (AR 145.) Although Jones worked full time at the majority of these positions, he worked only twenty hours per week at Ewing-Lundberg & Associates, Inc. (AR 202.)

## II. Medical History

In 2009, Jones's primary care physician, Julie Taylor, M.D., diagnosed Jones with hypertension, type II diabetes, foot pain, gout, planter fasciitis, sleep apnea, hypercholesterolemia, and high cholesterol. (AR 239–40, 306–07, 324–25.) She prescribed Caduet, Colchicine, Indomethacin, and Mavik and referred Jones to podiatrist David A. Gerst. (AR 246, 306–07.) Dr. Gerst diagnosed Jones with planter fasciitis and prescribed custom orthotics in April 2009. (AR 247.) He opined that Jones's foot pain derived from the tarsal metatarsal joint. (*Id.*)

Later that year, podiatrist Eveleigh Williams diagnosed Jones with plantar fasciitis. (AR 257.) Dr. Williams injected Kenalog and Marcaine into Jones's left foot and provided Jones with a ten-minute muscle stimulation. (*Id.*) Dr. Williams also prescribed Naprosyn to be taken twice per day. (*Id.*)

Jones visited Renaud M. Gueret, M.D. at John H. Stroger, Jr. Hospital on July 22, 2009. (AR 261.) Jones reported that his continuous positive airway pressure ("CPAP") machine (which he had used to treat his sleep apnea for more than ten years) had been giving him eye infections and that he could not sleep because he worried about paying his bills. (*Id.*) Jones stated that he woke up twice during the night to use the restroom and had feelings of depression due to his medical conditions. (*Id.*) At the same time, however, Jones reported that he did not experience daytime sleepiness and that he felt refreshed in the morning. (*Id.*) Indeed, according

to Dr. Gueret's progress notes from earlier that year, Jones reported sleeping well "most of the time." (AR 251.) Dr. Gueret encouraged Jones to use his CPAP machine for at least four hours per night, to lose weight, and to exercise. (AR 263.) Dr. Gueret also arranged for Jones to receive a replacement mask for his CPAP machine. (*Id.*)

Manharlal Tanna, M.D. performed a consultative examination for the Bureau of Disability Determination Services on September 30, 2009. (AR 269.) Dr. Tanna noted that Jones appeared to be "somewhat" depressed and that Jones had a history of sleep apnea, chest discomfort, gout, plantar fasciitis, and diabetes. (AR 270–72.) On examination, Dr. Tanna observed that Jones had mild difficulty walking on his toes and getting on and off the examining table and had moderate difficulty walking on his heels. (AR 273.) Jones, however, was able to "move[] about the examination room without apparent hesitation, difficulty or discomfort." (AR 270.)

On October 7, 2009, Angelica Ortiz, a psychologist and state medical consultant, diagnosed Jones with major depressive disorder and noted that he was "grossly obese." (AR 279, 281.) Later that month, Richard Bilinsky, M.D., also a state medical consultant, conducted a physical residual functional capacity ("RFC") assessment and opined that Jones could occasionally lift fifty pounds; frequently lift twenty-five pounds; and stand, sit, or walk for six hours in an eight-hour day. (AR 297–304.) Jones's ability to push and pull was limited in his lower extremities, and he could only occasionally climb ramps or stairs, crouch, or crawl. (AR 298–99.) Jones could not, however, climb ladders, ropes, or scaffolds. (AR 299.) Although Jones could frequently stoop and kneel, Dr. Bilinsky noted that Jones needed to avoid areas with poor ventilation that were concentrated with fumes, odors, dusts, and gases. (AR 299, 301.)

4

On October 28, 2009, psychologist Kirk Boyenga completed a psychological review of Jones. (AR 283.) He opined that Jones suffered from mild depression and dysthymia and had mild limitations maintaining social functioning and concentration, persistence, or pace. (AR 286, 293.) Dr. Boyenga also noted that Jones's impairments were not severe and that he had no restrictions in activities of daily living or episodes of decompensation of an extended duration. (AR 293.)

Jones had a follow-up appointment concerning his sleep apnea with Swamy Nagubadi, M.D., on February 4, 2010. (AR 347.) Dr. Nagubadi performed the examination for Dr. Gueret, Jones's treating physician. (*Id.*) Jones reported that he was feeling better with the assistance of the new CPAP mask and that he was sleeping well from approximately 11:00 PM to 7:00 AM. (*Id.*)

Verdell Williamson, a nurse practitioner,[4] completed an RFC questionnaire for Jones on April 29, 2010. (AR 356–58.) Nurse Williamson diagnosed Jones with type II diabetes, sleep apnea, hypertension, hypercholesterolemia, obesity, planter fasciitis, depression, and anxiety that manifested itself in the form of panic attacks. (AR 356.) Nurse Williamson noted that Jones's symptoms included fatigue, dizziness, abdominal and leg cramps, and foot pain and opined that Jones could sit for 1.5 hours; stand for fifteen minutes; and sit, stand, or walk for less than two hours in an eight-hour day. (AR 356–57.) According to Nurse Williamson, Jones occasionally needed the use of a cane to stand or walk and could rarely lift ten pounds in a competitive work situation. (AR 358.) Nurse Williamson also noted that Jones would need to take breaks every

---

[4] It is unclear whether Williamson is a medical doctor or a nurse practitioner. (*See* AR 27, 358.) Because Jones refers to Williamson as a nurse practitioner in his briefs, the court will do the same. (*See, e.g.*, dkt. 14 at 2.)

5

thirty minutes during an eight-hour workday and that Jones would likely need to miss more than four days of work per month due to his impairments. (AR 357–58.)

### III. Disability Claim and Hearing Testimony

Jones applied for DIB and SSI on April 22, 2009.[5] (AR 21, 138–43.) In both applications, he alleged that he had been unable to work since February 20, 2009. (AR 139, 141.) The Social Security Administration denied his claim initially on October 30, 2009 (AR 80–83) and on reconsideration on March 3, 2010. (AR 84–91.) Jones requested a hearing before an ALJ on April 20, 2010 (AR 92–93), and ALJ Jose Anglada held a hearing on December 16, 2010. (AR 36–74.) At the hearing, Jones testified on his own behalf. (*See* AR 42.) Susan Entenberg, a vocational expert, also testified at the hearing. (AR 38.)

#### A. Jones's Testimony

Jones testified that he has been fired from all of his recent jobs for falling asleep at work due to his sleep apnea or for his inability to walk or stand due to his gout and plantar fasciitis. (AR 42.) According to Jones, he began receiving unemployment benefits after losing his full-time job in December 2009. (AR 60–62.) In response to Jones's testimony, the ALJ asked Jones how he could receive unemployment benefits when his employer had good cause to terminate his employment given that he was falling asleep at work. (AR 61.) Jones was unable to offer an explanation. (*Id.*)

Jones has used a CPAP machine for the past ten years. Although the device has improved his sleep apnea, Jones claims that it has not alleviated his condition. (AR 43.) Indeed, Jones testified that he continues to wake up two to three times per night gasping for air. (AR 44, 62.) In addition, Jones asserted that he experiences pain in his feet and toes approximately once per

---
[5] Although the application summaries indicate a filing date of May 7, 2009 (*see, e.g.*, AR 141), both the ALJ's opinion (*see* AR 21) and Jones's opening brief (*see* dkt. 14 at 1) provide April 22, 2009 as the date of filing.

6

month and that, as a result, he cannot walk for up to five days. (AR 45.) Jones further testified that he is able to stand in one place for only fifteen minutes, walk two blocks before feeling dizzy and fatigued, and lift ten to fifteen pounds. (AR 53–54.)

### B. The Vocational Expert's Testimony

The vocational expert, Susan Entenberg, answered a number of hypothetical questions about Jones's ability to find work. The ALJ first asked Entenberg whether a hypothetical claimant could perform Jones's past relevant work when the claimant held greater than a high school education; could lift and carry twenty pounds occasionally and ten pounds frequently; could be on his feet standing or walking for six hours in an eight-hour day; could sit for six hours with normal rest periods in an eight-hour day; could not work at heights, climb ladders, or frequently negotiate stairs; could only occasionally crouch, balance, or crawl; and would need to avoid poorly ventilated areas and dangerous machinery. (AR 67.) Entenberg answered that the hypothetical claimant could perform Jones's previous job as a security guard. (AR 68.) Further, Entenberg stated that the hypothetical claimant could also work as a cashier, food preparation worker, or packer. (*Id.*)

The ALJ then added the modification that the hypothetical claimant would be restricted to standing or walking no more than four hours in an eight-hour day and asked how that limitation would affect the claimant's ability to perform a job. (AR 69.) Entenberg responded that the claimant could still perform "some of the security guard jobs" because many involved a combination of sitting and standing. (*Id.*) The limitation, however, would reduce the number of cashier and packer jobs available and would eliminate entirely the claimant's ability to secure a job as a food preparation worker. (AR 69–70.)

Finally, the ALJ directed Entenberg to the RFC questionnaire completed by Nurse Williamson and asked how the restrictions contained in that questionnaire would impact the hypothetical claimant's ability to secure a job. (AR 71.) Entenberg responded that no work would be available for a claimant with those limitations. (*Id.*)

### C. Denial of Claim

The ALJ issued an opinion denying Jones's claim for benefits on January 10, 2011. (AR 21–31.) Jones requested review of the ALJ's decision, which the Appeals Council denied on May 25, 2012, making the ALJ's decision the final decision of the Commissioner. (AR 1–3.)

## LEGAL STANDARD

A court should uphold the final decision of the Commissioner "if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates* v. *Colvin*, 736 F.3d 1093, 1097–98 (7th Cir. 2013) (citing 42 U.S.C. § 405(g); *Jelinek* v. *Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson* v. *Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. of N.Y., Inc.* v. *NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). A court may not "reweigh the evidence or substitute [its] own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, [the court] must uphold the decision under review." *Shideler* v. *Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ's decision, however, must rest on "adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger* v. *Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, the ALJ must build an accurate and "logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony

and evidence." *Shideler*, 688 F.3d at 310 (quoting *Schmidt* v. *Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner* v. *Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele* v. *Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## ANALYSIS

### I. Legal Framework

To determine whether a claimant is disabled and thus eligible for DIB or SSI, an ALJ uses a five-step inquiry. *See* 20 C.F.R. §§ 404.1520, 416.920; *Kastner*, 697 F.3d at 646. First, the ALJ determines whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520, 416.920. If so, the claimant is not eligible for benefits. *See id.* At step two, the ALJ assesses whether the claimant has an impairment or combination of impairments that is severe. *See id.* At step three, the ALJ determines whether the impairments meet or equal a listed impairment in the Social Security regulations and thus preclude the performance of substantial gainful activity. *See id.* At step four, the ALJ analyzes the claimant's RFC to determine whether the claimant can perform his past relevant work. *See id.* Finally, at step five, the ALJ determines whether the claimant can perform other work in the national economy considering the claimant's RFC, age, education, and experience. *See id.* "The process is sequential, and if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then she need not progress to the next step." *Young* v. *Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor* v. *Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

## II. The ALJ's Decision

The ALJ found that Jones had not engaged in substantial gainful activity since February 20, 2009[6] and determined that Jones suffered from several severe impairments: sleep-related breathing disorder, hypertension, diabetes mellitus, plantar fasciitis, gout, high cholesterol, and obesity. (AR 23–24.) At step three, the ALJ determined that no treating or examining physician indicated findings that would satisfy the severity requirements of any listed impairment. (AR 24.) In doing so, the ALJ noted that Jones's obesity did not change this result, "either singularly or in combination with his other . . . impairments." (AR 25.)

The ALJ then determined Jones's RFC and found that Jones could perform light work as defined in the federal regulations. (*Id.*) Specifically, the ALJ found that Jones could lift and carry twenty pounds occasionally and ten pounds frequently; that he could sit, stand, and walk for up to six hours in an eight-hour day; that he could not climb ladders or frequently climb stairs; that he could occasionally balance, crouch, or crawl; that he needed to avoid concentrated exposure to fumes, odors, dusts, gases, or poorly ventilated areas; and that he could not work at unprotected heights or around moving or dangerous machinery. (*Id.*) In arriving at this conclusion, the ALJ discounted Jones's statements regarding the intensity, persistence, and limiting effects of his impairments because Jones "lived alone[,] . . . manage[d] his own personal care," and "cook[ed] simple meals, d[id] laundry, water[ed] his lawn, and grocery shop[ped]" during the relevant time period; Jones held jobs on and off since his alleged onset date; Jones's medical care was conservative and sporadic; and Jones's statements that he was fired for falling asleep at work were inconsistent with the fact that Jones received unemployment benefits. (AR

---

[6] Although the ALJ noted that Jones had "worked multiple jobs, and . . . earned, in combination, at levels at or above substantial gainful activity" since his alleged onset date, the ALJ gave Jones the benefit of the doubt given the lack of clarity in the record as to "the reasons for the claimant's terminations." (AR 23–24.)

26–28.) The ALJ also gave little weight to the restrictive RFC assessment from Nurse Williamson given its inconsistency with the record as a whole and instead gave great weight to the "detailed and enlightening" examination notes of Dr. Tanna. (AR 27–28.) Given this RFC assessment, the ALJ concluded at step four that Jones could perform his past work as a security guard. (AR 28.) Finally, at step five, the ALJ found that Jones could perform other jobs in the national economy, including that of a cashier, food preparer, and packer. (AR 31.)

III.  **Whether the ALJ Improperly Assessed Jones's Credibility**

Jones first argues that the ALJ improperly assessed his credibility in determining his RFC. An "ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones* v. *Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). As such, the court need not undertake a *de novo* review of the medical evidence, and must simply "examine whether the ALJ's determination was reasoned and supported." *Elder* v. *Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). Only when the credibility determination "lacks any explanation or support" is the determination found to be patently wrong and deserving of reversal. *See id.*; *see also Powers* v. *Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). With that said, a court has "greater freedom to review the ALJ's decision" when an ALJ's credibility determination rests, as here, "on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor]." *Clifford* v. *Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (alteration in original) (quoting *Herron* v. *Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)).

A generous reading of the ALJ's opinion indicates that he relied on the following objective factors and purported implausibilities in discounting Jones's credibility: (1) Jones lived alone for at least part of the relevant time period and was able to care for himself, shop, and

search for jobs online; (2) Jones held jobs since his alleged onset date; (3) Jones's medical treatment was conservative and sporadic; and (4) Jones's report of being terminated for falling asleep at work was inconsistent with his statement that he received unemployment benefits, as an individual is not entitled to such benefits when fired for good cause, such as sleeping on the job. (AR 26–28.) The court finds that these reasons are insufficient to support an adverse credibility determination.

First, the fact that Jones lived alone and cared for himself after his alleged disability onset date does not counsel against a finding of disability. Indeed, there are "critical differences" between activities of daily living and a full-time job such as greater "flexibility in scheduling the former" and the fact that a claimant "is not held to a minimum standard of performance" in carrying out daily life. *Bjornson* v. *Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also Hughes* v. *Astrue*, 705 F.3d 276, 279 (7th Cir. 2013) ("The applicant cannot afford to hire a laundress, so she has to do the laundry herself, painful though that may be."); *Mendez* v. *Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). While an ALJ may place some weight on a claimant's ability to perform household activities in assessing whether the claimant can hold a job outside of the home, *see Mendez¸* 439 F.3d at 362, the ALJ afforded it undue weight in this case, citing it as one of only four, equally insufficient factors counseling in favor of an adverse credibility finding. As such, Jones's daily activities fall well short of the substantial evidence required to support the ALJ's decision.

Second, Jones's employment record is not inconsistent with his claim of disability. It is true that Jones held several jobs after the alleged disability onset date. But Jones stayed at those

positions for only a few months and testified that he lost the jobs because of his severe impairments. (*See* AR 42, 145–51.) Specifically, Jones testified that he was fired from these positions for falling asleep on the job due to his sleep apnea, or because of his gout- and plantar-fasciitis-induced inability to walk. (*See* AR 42.) Jones, moreover, worked at one of the jobs for only twenty hours per week. (*See* AR 202.) Accordingly, Jones's stretch of month-to-month work says little about his capacity for full-time employment. *See Larson* v. *Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) (finding the ALJ's adverse credibility determination based on the claimant's ability to "hold down" jobs insufficient when the claimant testified that she only worked part time and was fired or quit because of her impairments); *Gentle* v. *Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working."); *Henderson* v. *Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003) ("[T]he fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation.").

Third, the ALJ erred in citing Jones's conservative and sporadic treatment history. In making his adverse credibility finding, the ALJ noted that "[t]he claimant's medical record reveals no more than conservative and sporadic treatment, at best, for his impairments." (AR 26.) Before relying on the sporadic nature of Jones's treatment, however, the ALJ had an obligation to explore Jones's reasons for seeking treatment irregularly, which he failed to do; indeed, there is no questioning on this point in the hearing transcript. *See Shauger* v. *Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference."). The

ALJ's failure to ask is inexcusable, as questioning could have revealed a multitude of reasons unrelated to medical improvement for Jones's hesitancy to seek treatment more frequently, such as an inability to afford it, ineffectiveness of the treatment, or intolerable side effects. *See id.* Because the ALJ failed to probe the reasoning behind Jones's sporadic treatment, the nature of the treatment cannot support his adverse credibility determination.

The government argues that the thrust of the ALJ's decision is not so much sporadic treatment as conservative treatment, and that therefore, the ALJ's decision is adequately supported. Indeed, the government argues, the ALJ noted that Jones's podiatrist had prescribed only custom orthotics for Jones's foot pain and that Jones's treatment for his sleep apnea— namely, his CPAP machine—had remained unchanged for more than a decade. On this front, however, the ALJ's opinion is deficient as well, as the ALJ cites no medical evidence or standards indicating what type of additional treatment Jones should have received given his impairments. *See Martinez* v. *Astrue*, No. 2:10-CV-370-PRC, 2011 WL 4834252, at *8 (N.D. Ind. Oct. 11, 2011) ("The ALJ may 'consider conservative medical treatment in assessing the severity of a condition,' but should cite medical evidence about what kind of treatment would be appropriate." (quoting *Brown* v. *Barnhart*, 298 F. Supp.2d 773, 797 (E.D. Wis. 2004)). Absent such evidence, the ALJ was forced to play doctor and to draw his own conclusion regarding the appropriate level of treatment. That determination was impermissible. *See Myles* v. *Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("The inference that [insulin] was not prescribed because [the claimant] was not experiencing significant problems appears to be the ALJ's own inference, and is wholly unsupported by the record."); *Schmidt* v. *Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("Common sense can mislead; lay intuitions about medical phenomena are often wrong.").

Fourth, the ALJ committed an error of logic in relying on Jones's receipt of unemployment benefits to discredit his testimony. Specifically, the ALJ reasoned that although Jones "reported being let go as a result of sleeping on the job, . . . the claimant has been receiving unemployment benefits, . . . indicat[ing] that he was terminated for reasons other than good cause, such as sleeping on the job." (AR 28.) Although the ALJ is correct that individuals are disqualified from receiving unemployment benefits under Illinois law if they are fired for misconduct, *see* 820 Ill. Comp. Stat. 405/602, the ALJ erroneously assumed (as the government concedes) that falling asleep at work would necessarily amount to misconduct within the meaning of the statute. *See Washington* v. *Bd. of Review*, 570 N.E.2d 566, 569, 211 Ill. App. 3d 663, 156 Ill. Dec. 90 (1991) (finding that falling asleep for thirty minutes during a meeting did not constitute misconduct disqualifying the plaintiff from receiving unemployment benefits). The ALJ's error is grounds for remand. *See Allord* v. *Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (noting that an ALJ may not base a credibility determination on "errors of fact or logic").

Finally, it bears mentioning that the ALJ used the following boilerplate paragraph in his decision:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms cannot be fully credited to the extent they are inconsistent with the above residual functional capacity assessment.

(AR 26.) As the Seventh Circuit has noted with respect to nearly identical templates, this paragraph raises significant problems, including "the fact that [it] puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion." *Filus* v.

*Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *see also Bjornson*, 671 F.3d at 645 ("Doubts about credibility were thus critical to [the ALJ's] assessment of ability to work, yet the boilerplate implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be."). Although the inclusion of this language is harmless when the ALJ has otherwise explained his conclusion adequately, *see Filus*, 694 F.3d at 868, in this case he has not. As such, the ALJ should take note of the flaw on remand.

On the whole, the ALJ did not provide sufficient reasons from which the court can discern support for his finding that Jones was not credible. While the court will not decide whether Jones is entitled to an award of benefits, it is clear that the ALJ did not "build a logical bridge from the evidence to his conclusion." *Shideler*, 688 F.3d at 310 (quoting *Schmidt*, 395 F.3d at 744). Because the ALJ's determination lacks substantiated evidentiary support, a remand is required.

## IV. Whether the ALJ's RFC Assessment was Flawed

Jones also argues that the ALJ failed to account for Jones's standing and walking limitations, as well as his sleep apnea, in determining Jones's RFC. Because the court is remanding the case for further proceedings in accordance with this opinion, it will address these arguments only briefly.

First, the ALJ did not adequately explain how he arrived at the standing and walking limitations contained in the RFC assessment. At step two of the five-step sequential analysis, the ALJ found Jones's plantar fasciitis, gout, and obesity to be severe impairments but later determined that Jones could "stand and/or walk for up to six hours during an eight-hour workday." (AR 24–25.) It is unclear how the ALJ arrived at that conclusion. In his decision, the ALJ rejected the severe limitations contained in Nurse Williamson's RFC assessment and

placed great weight on Dr. Tanna's consultative examination, during which Dr. Tanna noted that Jones had a normal gait and the ability to bear weight without the use of an assisting device. (AR 271.) Dr. Tanna also noted, among other things, that Jones had mild difficulty walking on his toes and getting on and off the examination table but observed that Jones "move[d] about the examination room without apparent hesitation, difficulty, or discomfort." (AR 270–71.) Dr. Tanna's observations, however, are based on a sixty-minute examination, and Dr. Tanna did not complete an RFC assessment. And while the ALJ may have intended to rely on Dr. Bilinsky's assessment, which provides that Jones can stand, sit, or walk for six hours in an eight-hour day (AR 298), the ALJ did not reference that assessment in his decision. *See Kastner* v. *Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (noting that a court may not affirm an ALJ on grounds not relied on by the ALJ). Absent additional medical support for the RFC assessment, it is difficult to see how the ALJ arrived at Jones's standing and walking limitations. Undoubtedly, the ALJ's revised credibility determination will impact his resolution of these issues on remand.[7]

Second, and similarly, the ALJ found Jones's sleep-related breathing disorder to be a severe impairment at step two (AR 24) but did not make clear whether this impairment is reflected in the RFC assessment, and, if not, why. Although "[a]n ALJ need not specifically address every piece of evidence, . . . [he] must provide a 'logical bridge' between the evidence and his conclusions." *Varga* v. *Colvin*¸794 F.3d 809, 813 (7th Cir. 2015). The ALJ noted that Jones had reported to Dr. Geuret that "he sleeps well most of the time" (AR 26), but those same treatment notes state that Jones's CPAP machine was giving him eye infections and that Jones

---

[7] Moreover, the ALJ's perfunctory reference to Jones's obesity calls into question whether the ALJ adequately considered the impact of that impairment on Jones's other ailments. (*See* AR 25 ("[T]he undersigned does not find that the claimant's obesity either singularly or in combination with his other medically determinable severe impairments results in limitations greater than those assessed in this opinion.").) On remand, the ALJ must consider Jones's medical situation as a whole to determine, for example, whether the interaction between Jones's obesity and his other impairments renders him totally disabled. *See Barrett* v. *Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004).

was waking up at least twice per night.  (*See* AR 261); *see also Scott* v. *Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (noting that an ALJ may not "cherry-pick" portions of the record while ignoring others to support a denial of benefits).  Moreover, the ALJ's consideration of Jones's sleep apnea was at least partially corrupted by his erroneous determination that Jones could not have been fired for falling asleep at work because he received unemployment benefits, as well his unsupported conclusions regarding the sporadic and conservative nature of Jones's treatment.  On remand, the ALJ must adequately explain his conclusions regarding Jones's ability to work in the national economy.

## CONCLUSION AND ORDER

For the foregoing reasons, the court grants Jones's request to reverse the Commissioner's decision (dkt. 14) insofar as it seeks a remand and denies the Commissioner's motion for summary judgment.  (Dkt. 15.)  The court remands the case to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Date:   November 25, 2015

U.S. District Judge Joan H. Lefkow